IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

TIMOTHY RACINE BULGER,     )
                               )
       Plaintiff,         )
                               )
   v.                  )    CIVIL ACTION NO. 1:13-cv-127-CSC
                               )
CAROLYN W. COLVIN,       )
ACTING COMMISSIONER OF   )
SOCIAL SECURITY,         )
                               )
       Defendant.    )

## MEMORANDUM OPINION AND ORDER

### I. Introduction.

The plaintiff applied for supplemental security income benefits under Title XVI of the

Social Security Act, 42 U.S.C. § 1381, *et seq.*, alleging that he was unable to work because

of a disability. His application was denied at the initial administrative level. The plaintiff

then requested and received a hearing before Administrative Law Judge ("ALJ") Tracy S.

Guice. Following the hearing, the ALJ also denied the claim. The Appeals Council rejected

a subsequent request for review. The ALJ's decision consequently became the final decision

of the Commissioner of Social Security (Commissioner).[1] *See Chester v. Bowen*, 792 F.2d

129, 131 (11th Cir. 1986). The case is now before the court for review pursuant to 42 U.S.C.

---

[1]Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub. L. No.
103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social
Security matters were transferred to the Commissioner of Social Security.

§§ 405 (g) and 1383(c)(3).[2]  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed.

## II.  Standard of Review

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person is unable to

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

To make this determination[3] the Commissioner employs a five step, sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520, 416.920.

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?
>
> An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled.

---

[2] Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge.

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.

2

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The standard of review of the Commissioner's decision is a limited one. This court must find the Commissioner's decision conclusive if it is supported by substantial evidence. 42 U.S.C. § 405(g); *Ingram v. Comm. of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007). "Substantial evidence is more than a scintilla, but less than a preponderance. It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158-59 (11th Cir. 2004). A reviewing court may not look only to those parts of the record which supports the decision of the ALJ but instead must view the record in its entirety and take account of evidence which detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986). The court "may not decide the facts anew, reweigh the evidence, or substitute . . . [its] judgment for that of the [Commissioner]." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (alteration in original) (quotation marks omitted).

> [The court must, however,] . . . scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] . . . factual findings . . . No similar presumption of validity attaches to the [Commissioner's] . . . legal conclusions, including determination of the proper standards to be applied in evaluating claims.

*Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

---

[4] *McDaniel v. Bowen*, 800 F.2d 1026 (11th Cir. 1986) is a supplemental security income case (SSI). The same sequence applies to disability insurance benefits. Cases arising under Title II are appropriately cited as authority in Title XVI cases. *See e.g. Ware v. Schweiker*, 651 F.2d 408 (5th Cir. 1981) (Unit A).

### III.  The Issues

**A.  Introduction.**

Bulger was 38 years old at the time of the hearing before the ALJ and has an 11th grade education.  (R. 70).  His prior work experience includes work as an orderly and a lumber stacker.  (R. 22).   Following the administrative hearing, the ALJ concluded that Bulger has severe impairments of borderline intellectual functioning, depression, lumbar radiculopathy, left groin sprain and hypertension.  (R. 15).  The ALJ also found that Bulger had a severe impairment of "headaches," but immediately contradicted this finding by also concluding that Bulger's headaches were a "non-severe impairment."  (R. 15).  The ALJ concluded that Bulger was unable to perform his past relevant work.  (R. 22).  Nonetheless, the ALJ concluded that Bulger was not disabled because the plaintiff has the residual functional capacity to perform other work that is available in the national economy.

**B. The Plaintiff's Claims.**  As stated by the plaintiff, his claims are

1. Whether the Commissioner's decision should be reversed because the ALJ failed to give great weight to the opinions of Bulger's treating physician, Dr. Richard Bendinger.

2.  Whether the Commissioner's decision should be reversed because the ALJ's finding that Bulger is capable of performing light work is not supported by substantial evidence.

3.  Whether the Commissioner's decision should be reversed because, prior to relying on the VE's testimony, the ALJ failed to explain an inconsistency between the VE's testimony and the *Dictionary of Occupational Titles*.

In this case, the ALJ's opinion is so comprehensively infected with legal error and

4

misstatements of the record that it is not possible to consider the first two issues raised by the plaintiff separately from many of the other glaringly-obvious fatal deficiencies in the ALJ's determination of Bulger's residual functional capacity.  Accordingly, by necessity, the court will address the first two issues raised by the plaintiff within the context of its consideration of the ALJ's opinion and the record as a whole.  *See Powell v. Heckler*, 773 F.2d 1572, 1575 (11th Cir. 1985) (holding that the presumption of deference to the Commissioner's factual findings "does not permit [the court] to close [its] eyes when presented with clear error in the application of the governing statute, or with evidence insubstantial on its face"); *see also Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (citations omitted) (holding that, although the court's review of the Commissioner's findings of fact is limited to determining whether those findings are supported by substantial evidence, the reviewing court has the duty to "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings"); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) ("In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the Secretary's decision.").

Further, because the court's consideration of the first two issues lead to the conclusion that this case must be reversed, the court pretermits consideration of the third issue raised by the plaintiff.

## IV.  Discussion

A disability claimant bears the initial burden of demonstrating an inability to return

to his past work.  *Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990).  In determining whether the claimant has satisfied this burden, the Commissioner is guided by four factors: (1) objective medical facts or clinical findings; (2) diagnoses of examining physicians; (3) subjective evidence of pain and disability, e.g., the testimony of the claimant and his family or friends; and (4) the claimant's age, education, and work history.  *Tieniber v. Heckler*, 720 F.2d 1251 (11th Cir. 1983).  The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review.  *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981).  The ALJ must also state, with sufficient specificity, the reasons for his decision referencing the plaintiff's impairments.

> *Any* such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual *shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.*

42 U.S.C. § 405(b)(1) (emphases added).  Within this analytical framework, the court will address the plaintiff's claims.

## A.     Failure to Consider All Impairments When Determining Residual Functional Capacity

At the outset, the court notes that, at step two of the sequential evaluation process, the the ALJ found that Bulger's headaches were a severe impairment, but then the ALJ proceeded to state that she found Bulger's headaches were not a severe impairment.  (R. 15) These findings are erroneous because, as a matter of law, a single impairment cannot simultaneously be both severe and non-severe.  *See* 20 C.F.R. 416.920(c) (providing that "an

6

impairment or combination of impairments" is a "severe impairment" if it "significantly limits your physical or mental ability to do basic work activities"); 20 C.F.R. § 416.921(a) ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

Further, the record does not support the reasons given by the ALJ for finding that Bulger's headaches were a non-severe impairment. The ALJ's explanation for this finding was as follows:

> With regard to the claimant's alleged headaches, the Administrative Law Judge notes that there is only one treatment record with regard to that allegation. The Administrative Law Judge notes that that [sic] record indicated the claimant was in no acute or respiratory distress. The diagnosis on that date was tension headache. The Administrative Law Judge does note that a subsequent office note on January 23, 2011 stated "no refill" and there is no indication that the claimant presented for any further follow up with regard to his headaches (Exhibit 6-F). Therefore, the claimant's allegation of headaches is determined to be a non-severe impairment because follow up treatment is not noted in the record.

(R. 15).

The record reflects that, on September 18, 2010, Dr. Kelley treated Bulger for a headache. (R. 281). As observed by the ALJ, Dr. Kelley noted that Bulger was in "no acute distress or respiratory distress" (R. 281). However, nothing else in the ALJ's explanation correctly represents the record regarding Bulger's headaches. Although Bulger was not in acute or respiratory distress, Dr. Kelley noted that Bulger reported that he hurt all over, that the headache had caused "nausea and vomiting over the past couple of days" and that Bulger had a history of migraine headaches. (R. 281). Treatment notes also indicated that Bulger

7

reported fatigue and dizziness with the headache.  (R. 281).  Bulger's blood pressure at the time of the office visit was 118/85.  (R. 281).  Dr. Kelley diagnosed the headache as a tension headache and prescribed Toradol, Flexiril, and Lortab.

Shortly thereafter, on September 30, 2010, Dr. Richard Bendinger treated Bulger again for a headache.  Specifically, Bulger presented with a complaint that he had a headache that had begun on September 28, 2010 that was so severe that he passed out.  (R 285).  Bulger was not sure whether he fell and hit his chest when he passed out, but his chest hurt and his head also still ached.  (R. 285).  His blood pressure at that time was 170/112.  (R. 285).  Dr. Bendinger noted that Bulger had "uncontrolled hypertension," which he diagnosed as being "secondary to pain."  (R. 285).  A chest X-ray was normal, and Dr. Bendinger noted that he would order a CT scan for further testing regarding the headaches.  (R. 285).  Several medications were prescribed, including Prednisone, although the notes regarding other prescriptions are illegible.  (R. 285).

Another undated handwritten note on Dr. Kelley's medical record of the September 18, 2010, office visit indicates that, at some point prior to January 23, 2011, Bulger was prescribed Thoradol and Fiorinal, and the prescribed dosages of each medication were also noted.  (R. 215). Subsequently, on January 23, 2011, Dr. Kelley did not write "no refill" on his notes; rather, he wrote "rx refill Fiorinal" with the same dosage indications by this note as were on the earlier note regarding the Fiorinal prescription.  (R. 215).  If anything, the fact that Bulger had his Fiorinal prescription refilled is evidence that he *did* fill and take the

prescription.

The court notes that, on January 24, 2011, on a medical records update form, Bulger reported to the Commissioner that he was taking Piroxicam (prescribed by Dr. Bendinger for inflamation), Butalbital ASP Caffiene Capsule (prescribed by Dr. Kelley for migraines), and Cyclodeuzaprine (prescribed by Dr. Kelley for muscle spasms.).  He also stated that he took the following nonprescription medications: Excedrine Migraine for headaches, Excedrine Tension for headaches, Tylenol Extra Strength for pain, and an acid reducer for acid reflux and heartburn.  Dr. Bendginger's notes dated January 31, 2011, indicate that he diagnosed Bulger with trigemenal autonomic cephalgia (severe headaches).  (R. 294).

At the April 13, 2011, hearing, Bulger testified that he was not taking prescription medication for his headaches at that time.  However, he stated that he had the name of his headache prescription with him and that he had recently attempted to get the prescription refilled but was financially unable to do so.  That exchange was as follows:

> ALJ: Okay. Headaches. You have problems with headaches?
> Bulger: Yes, ma'am.
> ALJ: You taking medication for that?
> Bulger: I had a -- I can't think of the name. I got it right here, though.
> ALJ: You have some medication for that? Do you take it every day?
> Bulger: I did before I ran out and I can't afford to get that on [sic] prescription re-did.
> ALJ: Have you tried to take your prescriptions over to Walmart to see if they would help you with any prescriptions?
> Bulger: Yes. That's where it's at.
> ALJ: Okay. And how much is that prescription to fill it?
> Bulger: $42.00.
> ALJ: Even under the prescription–
> Bulger: Yes.

ALJ: Have you talked to your physician about that? Has he provided you with any samples?

Bulger: Not that, because I can't take the pain medicine because it had my chest hurt so he prescribed me something with less milligrams in it that caused my chest to start hurting. I don't know why that happened.

ALJ: What are you taking now? Are you taking mainly over-the counter medication or--

Bulger: Yes, over the counter right now until I can get that -- like Excedrin -- tension and --

ALJ: How often do you have headaches?

Bulger: Like I got one right now.

ALJ: How many times a week would you say you had a headache?

Bulger: I'd say about just -- a mild headache is at least about five, six days a week.

. . . .

ALJ: What about the headache pain? Where would you rate that on the pain scale?

Bulger: As a five, six.

ALJ: Is that with medication?

Bulger: Yes.

(R. 74-76).

Thus, at step two of the sequential evaluation process, the ALJ completely ignored both the medical record and Bulger's testimony showing unequivocally that his headache prescriptions had *not* been discontinued by his doctors. Instead, the ALJ misquoted the record to suggest that Dr. Kelley had decided not to refill those prescriptions.

Moreover, to the extent that Bulger stopped taking prescription headache medication sometime between January, 2011 and the April 13, 2011 hearing before the ALJ, his stated reason for doing so was *not* that the medication was no longer necessary or prescribed, but that he could not afford the medication.  Thus, poverty was the *only* reason reflected in the record for Bulger's failure to seek more treatment for his headaches and for the fact that he

10

did not refill his prescription for headache medication.   "To a poor person, a medicine that he cannot afford to buy does not exist." *Dawkins v. Bowen*, 848 F.2d 1211,1213 (11th Cir. 1988) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987).   However, at step two of the sequential evaluation process, in negating Bulger's testimony about the severity of his headaches solely on the basis of a record of discontinued treatment, the ALJ completely failed to address Bulger's testimony that he could not afford his prescription headache medication; rather, contrary to everything in the record on the topic, she clearly implied that he did not have any headache prescriptions to refill in the first place because Dr. Kelley had written down "no refill" (which, in fact, he never wrote) and because Bulger had not sought treatment for his headaches after September 18, 2010 (which, in fact, he had). Accordingly, the ALJ's explanation for dismissing the severity of Bulger's headaches due to discontinued treatment is both unsupported by the record and contrary to the well-established law in this Circuit.  *See Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003). ("[W]hen an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment."); *Swindle v. Sullivan*, 914 F.2d 222, 223 (11th Cir. 1990) holding that the decision of an ALJ must be reversed when that decision is not supported by substantial evidence).

Of course, the ALJ's total failure to reach any meaningful or factually-supported

decision on whether Bulger's headaches were severe or non-severe and her simultaneous legal errors and absolute misstatement of the record in dismissing the severity of those headaches would be merely "harmless" errors if not for the fact that these errors clearly carried over into her determination of Bulger's residual functional capacity. *See Griffin v. Comm'r of Soc. Sec.*, 560 Fed. Appx. 837, 842 (11th Cir. 2014) (holding that an ALJ's failure to find tinnitus to be a severe impairment was, at most, harmless error because the ALJ nevertheless considered the severity and limiting effects of the claimant's tinnitus at subsequent steps in the sequential evaluation process).   At step four of the sequential evaluation process, the ALJ repeated her misstatement regarding the extent of Bulger's treatment for headaches and her misstatement that Dr. Kelley discontinued refills of Bulger's prescription. (R. 19-20). The ALJ again failed to recognize that Dr. Bendinger treated Bulger for headaches in September 2010 and diagnosed trigeminal autonomic cephalgia in January 2011. (R. 20; 294).  Thus, at step four of the evaluation process, when the ALJ repeated the errors made at step two of the sequential evaluation process regarding Bulger's impairment of headaches, she erred by failing to consider all of the relevant evidence and by failing to follow the proper applicable legal standards in forming her residual functional capacity determination. 20 C.F.R. § 416.945 (a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record.").

Further, it is clear that, at step two of the sequential evaluation process, the ALJ determined that Bulger's headaches were a medically-determinable "impairment;" what is

not clear is whether she found that impairment to be severe or non-severe.  (R. 15).  In either

case, however, the ALJ was required to consider Bulger's headaches at step four in

determining his residual functional capacity.   20 CFR § 416.945(a)(2) ("We will consider

all of your medically determinable impairments of which we are aware, including your

medically determinable impairments that are not 'severe,' . . . when we assess your residual

functional capacity.").  However, at step four of the sequential evaluation process, although

the ALJ mentioned Bulger's complaints headaches in passing, the ALJ specifically listed the

following impairments as those that formed the basis of her determination of Bulger's

residual functional capacity: "borderline intellectual functioning, depression, lumbar

radiculopathy, hypertension, back and groin pain."  (R. 20).  Thus, the ALJ did not follow

the correct legal standard in determining Bulger's residual functional capacity because she

did not consider Bulger's medically-determinable impairment of headaches *at all* in making

that determination.  20 CFR § 416.945(a)(2); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir.

1986) (holding that an ALJ must consider the disabling effects of "every impairment,"

singly and in combination with other impairments)

**B.**    **Numerous Errors in Rejecting Bulger's Subjective Pain Testimony**

The ALJ "must consider a claimant's subjective testimony of pain if she finds

evidence of an underlying medical condition, and either (1) objective medical evidence to

confirm the severity of the alleged pain arising from that condition, or (2) that the objectively

determined medical condition is of a severity that can reasonably be expected to give rise to

13

the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). "If the ALJ refuse[s] to credit subjective pain testimony where such testimony is critical, he must articulate specific reasons for questioning the claimant's credibility." *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992). The ALJ may reject the claimant's complaints of pain, as not creditable, "and that determination will be reviewed for substantial evidence." *Id.*

In this case, the ALJ found that Bulger did have medically determinable impairments that "could reasonably be expected to cause the alleged symptoms;" however, she did not find Bulger's subjective testimony credible for three basic reasons: she found that the medical record was "sparse" and, based on misrepresentations of the objective findings contained in that record, she concluded that those findings were essentially normal (R. 21); in relying on the sparsity of the medical record, she dismissed Bulger's allegations of poverty without adequately developing the record and completely overlooked relevant record evidence (R. 21); and she discounted Bulger's reports of pain due to physical impairments because she found that an April 14, 2009 consulting examination conflicted with relatively more recent treatment records and opinions of Bulger's treating physician, while overlooking relevant contents of the treating physician's records (R. 20).

1.   **Misrepresentation of Clinical Findings and Objective Diagnositive Evidence as "Often" Yielding "Normal or Minimally Abnormal" Findings**

The ALJ dismissed Bulger's subjective testimony partly on the basis of the following findings:

[T]he claimant's clinical examination findings have often been found to be

14

normal or minimally abnormal, and the objective diagnostic evidence of record has been sparse.  As stated above, all x-rays were essentially within normal limits.  In addition, range of motion was grossly normal in both upper and lower extremities.

(R. 21).

First, aside from the specific examples provided in the quoted paragraph, it is not clear from the ALJ's opinion which examinations she deemed were "often . . . normal or minimally abnormal."  In light of the record as a whole, the statement that "clinical examination findings have often been found to be normal or minimally abnormal" makes no sense.  It is undisputed that the medical record is "sparse" because Bulger did not seek treatment often; therefore, clinical examinations have not "often" yielded findings of any kind, normal or otherwise.

Further, the clinical examination findings specifically referenced by the ALJ are not "normal or minimally abnormal" as the ALJ portrays them.  For example, the ALJ states that, "as stated above, all X-rays were essentially within normal limits."  (R. 21).  Earlier in her opinion, the ALJ stated: "X-rays of the lumbrosacral spine were essentially within normal limits."  (R. 18).  However, Bulger's April 14, 2009 X-ray report reads as follows:

THREE VIEWS OF THE LUMBROSACRAL SPINE: [T]he vertebral body heights and disc spaces appear to be well maintained.  A deformity at the superior border anteriorly in L2 is seen compatible with remote trauma or possible nonfused apophysis.  No osseous lesion is seen otherwise alignment appears normal.

IMPRESSION: Findings at L2 as described, likely secondary to remote trauma, although nonfused apophysis is also a possibility.  The examination appears otherwise essentially within normal limits.

15

(R. 263).

Thus, *except* for findings of a deformity that was likely secondary to remote trauma, the X-ray was "*otherwise* essentially within normal limits." (R. 263 (emphasis added)).  The problem, of course, is that Bulger's lower back pain was one of his medically-determinable impairments, and he stopped working in part *because he injured his back*.  (R. 254).  Thus, there is absolutely no excuse for the ALJ's utter failure to address or even acknowledge the only objective medical finding from the X-ray, which objectively *confirmed* that Bulger had suffered a back injury.  (R.2 63).  *See* 20 C.F.R. 416(a) ("In evaluating the intensity and persistence of your symptoms, including pain, we will consider *all* of the available evidence, including . . . the medical signs and laboratory findings." (Emphasis added)).  Obviously in this context, the fact that the X-ray was "*otherwise* essentially . . . normal" does not negate the one highly-relevant objective finding of an abnormality that indicated a back injury.  Bulger did not complain of other back-related issues; thus, one would *expect* the X-ray of his back to be "otherwise essentially within normal limits."  Thus, the record simply does not support the ALJ's dismissal of Bulger's subjective pain testimony based on her finding that the X-ray of Bulger's back was "essentially within normal limits."

Further, although Dr. Bendinger found during the April 14, 2009 examination that "range of motion was grossly normal in both upper and lower extremities," (R.21, 256), the ALJ overlooked the fact that Dr. Bendinger's April 2009 report *also* stated that Bulger "has full range of motion but does have some tenderness and pain with range of motion especially

16

in the lumbar spine." (R. 257, 258).  Dr. Bendinger's "only significant [clinical] findings" on April 14, 2009 "revealed lumbrosacral area paravertebral muscle tenderness and left groin tenderness, which appeared to be significant to palpation." (R. 256).  The ALJ herself found it "extremely significant" that Dr. Bendinger concluded in his April 14, 2009 report that Bulger's "ability to do work-related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling to be relatively unimpaired *with the exception of the chronic pain in his left groin*." (R. 20 (emphasis added); R. 256). Further, the ALJ misrepresented the X-ray taken in conjunction with the April 2009 examination as "essentially within normal limits" when the X-ray in fact revealed an abnormality consistent with Bulger's complaints of pain.  Under the circumstances, the lone finding in April 2009 that Bulger's *range of motion* was "grossly normal" – a single purportedly "essentially normal" finding the ALJ plucked out of context from Dr. Bendinger's written four-page report based on a single consultative examination in April 2009 – is not substantial evidence to support the ALJ's characterization that "clinical examination findings" (plural) "have often been found to be normal or minimally abnormal." (R. 263).  *See Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (holding that, although the court's review of the Commissioner's findings of fact is limited to determining whether those findings are supported by substantial evidence, the reviewing court has the duty to "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner's] factual findings").

**2.      Bulger's Failure to Seek or Comply With Treatment and Allegations of Poverty**

In dismissing Bulger's allegations of pain, and throughout her opinion,[5] the ALJ relied significantly on the scarcity (or alleged absence[6]) of objective medical evidence, and on the fact Bulger did not seek more extensive medical treatment. (*See, e.g.,* R. 21). However, as the ALJ recognized (R. 21), Bulger alleged that his failure to seek more frequent treatment and his failure to comply with his prescribed treatment was due to his poverty. (R. 21). Therefore, before rejecting Bulger's subjective testimony of pain, the ALJ was required to consider whether poverty, not lack of medical necessity, was the cause of Bulger's infrequent treatment, his failure to comply with prescribed treatment, and the lack of more extensive medical evidence. *See Marbury*, 957 F.2d at 839 (holding that, where, as here, the ALJ finds that the claimant has an objectively-determined medical impairment that could reasonably give rise to the claimant's subjective allegations of pain, the ALJ must consider the credibility of the claimant's subjective testimony, and the ALJ's stated reasons for rejecting that testimony must be supported by substantial evidence); *see also Ellison*, 355 F.3d at 1275 (holding that, when lack of medical treatment is a primary ground for finding that a claimant

---

[5]For example, in discounting Bulger's subjective testimony, the ALJ "specifically" noted the consulting psychologist's statement that the prognosis for Bulger's depression was "contingent on his physical complaints, primarily pain," and that "a physician should be consulted with regard to his prognosis." (R. 275, 21-22). Thus, the ALJ discounted not only Bulger's subjective testimony regarding the severity of pain due to his physical ailments, but also the limiting effects of his depression, on the theory that Bulger's pain would subside with treatment for his physical complaints.

[6]It is undisputed that the medical record is not extensive. The court notes, however, that the medical record is not quite as sparse as the ALJ represented it to be; as explained throughout this opinion, the ALJ clearly overlooked certain relevant medical records entirely.

is not disabled, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the treatment).

In this case, the ALJ found that Bulger's claims of poverty were inexcusable and that the lack of more extensive treatment and the failure to comply with prescribed treatment constituted evidence that undermined the credibility of his subjective testimony. (R. 21). She offered the following reasons for these conclusions:

> Nothing in the record suggests that the claimant's physical and/or mental impairments have been incapable of being alleviated or controlled with the proper and regular use of prescription and/or over-the-counter medications. In fact, the claimant reported that he was not taking any medication. It would seem that the claimant would ask his treating physicians for medication if his pain is as bad as he has reported it to be.

> The undersigned recognizes the paucity of medical evidence in this case, and she specifically acknowledges the overall lack of persistent and regular treatment and the lack of recent medical documentation of visits to physicians. It is reasonable to assume that if the claimant were experiencing physical and/or mental difficulties to a disabling degree, he would have presented to his physicians for ongoing treatment.

> As an excuse for his failure to seek treatment, the claimant has alleged that he is financially unable to afford to do so. However, the undersigned is not persuaded by the claimant's allegations that he has been financially unable to obtain medical treatment. Social Security Rulings 87-96 and 82-59 provide that a claim of financial inability to obtain prescribed treatment is only a justifiable cause for failure to follow the prescribed treatment when free community resources are unavailable. It is well-established that community clinics exist in the local area of the claimant's residence that offer both reduced cost and free medical treatment for indigent people. Nevertheless, there is no evidence that the claimant sought treatment from any of these facilities, or that he has even inquired about the availability of such treatment.

(R. 21).

The ALJ's explanation is rife with factual and legal errors.  For instance, although Bulger reported to Dr. Bendinger in April 2009 that he was not "currently" taking any medication at that time despite his pain (R. 254), the record is replete with evidence that Bulger did take medication both before and after that date, including narcotics and muscle relaxers, and that, when he could not afford prescription medication, he took over-the-counter medication for pain.  (R. 219, 237, 240, 242, 245, 281, 285, 293, 295, 296).  The most recent medical record from Bulger's treating physician, dated January 31, 2011, states that Bulger "is currently being treated with muscle relaxers and ste[r]oids, cephadyn."  (R. 293).  The court notes that, when the ALJ asked Bulger at the April 13, 2011 hearing if Dr. Bendinger "ha[d] [Bulger] on any medication," Bulger replied "not right now."  (R. 72).  In the context of the administrative hearing, however, this does not amount to a statement that he "was not taking any medication" (R. 21).  In fact, the ALJ noted: "You brought some medication in a bag with you today.  What is that medication?"  (R. 74).  Bulger explained that the medication was for his groin pain, his back pain, and a recent chest injury.  (R. 74).  He also testified that he recently had taken prescription medication for his headaches until his prescription ran out and he could not afford to get it refilled.  (R. 74).  In sum, there is no support in the record for the ALJ's findings that Bulger was "not taking any medication" and that he had not "ask[ed] his treating physicians for medication."  (R. 21).

Further, the ALJ's rejection of Bulger's allegation that he was too poor to afford

20

treatment is also flawed.  (R. 21).  Bulger lost his home due to lack of income and his wife

subsequently left him.  (R. 274). Bulger's driver's license is suspended because he cannot

pay child support for his two children. (R. 77).   He testified at the hearing before the ALJ

and also stated on several agency forms that he could not afford his prescription medication.

(R. 75, 237, 240, 242).  In fact, the ALJ did not find that Bulger *could* afford to pay for

treatment or prescription medication.  (R. 21).  Rather, she found that his inability to afford

treatment was not a justifiable cause for failure to seek and comply with treatment because

"[i]t is well-established that free community resources exist in the local area of the claimant's

residence" and "there is no evidence" that Bulger sought "or even inquired about the

availability of" free or reduced-cost medical treatment.  (R. 21).  As the ALJ recognized, a

claim of financial inability to obtain prescribed treatment is only a justifiable cause for failure

to follow the prescribed treatment when free community resources are unavailable.  (R. 21).

*See Dawkins*, 848 F.2d at 1213 ("We agree with every circuit that has considered the issue

that poverty excuses noncompliance.").

    However, the judicially-noticed existence of unnamed "free clinics in the area of the

claimant's residence" combined with the observation that the claimant never happened to

mention of those resources is *not* substantial evidence of unjustified compliance. Absence

of evidence that Bulger attempted to use a free clinic does not equate to evidence of absence

of any such attempt, particularly where the Commissioner bears the burden to develop that

evidence and utterly fails to do so.   "The burden of producing evidence concerning

21

unjustified noncompliance is on the [Commissioner]." *Dawkins*, 848 F.2d at 1214 n.8; *see also  Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997) (citing *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir.1981) ("[B]ecause a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record.").

SSR 82-59,[7] upon which the ALJ relied in dismissing Bulger's claims of poverty, provides:

> Where the treating source has prescribed treatment clearly expected to restore ability to engage in any SGA (or gainful activity, as appropriate), but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed.
>
> Development With the Claimant or Beneficiary--The claimant or beneficiary should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal.
>
> . . . .
>
> Under circumstances such as those described below, an individual's failure to follow prescribed treatment will be generally accepted as "justifiable" and, therefore, such "failure" would not preclude a finding of "disability" or that disability continues.
>
> . . . .
>
> *The individual is unable to afford prescribed treatment which he or she is*

---

[7]The ALJ stated that "Social Security Rulings 87-6 and 82-59 provide that a claim of financial inability to obtain prescribed treatment is only a justifiable cause for failure to follow the prescribed treatment when free community resources are unavailable." (R. 21). SSR 87-6 pertains to "The Role of Prescribed Treatment in the Evaluation of Epilepsy" and does not include any meaningful discussion of poverty as a justified cause for failure to follow prescribed treatment.  Bulger does not have epilepsy, and it is not clear why the ALJ relied on SSR 87-6.

22

> *willing to accept, but for which free community resources are unavailable.*
> Although a free or subsidized source of treatment is often available, the claim
> may be allowed where such treatment is not reasonably available in the local
> community. All possible resources (e.g., clinics, charitable and public
> assistance agencies, etc.), must be explored. Contacts with such resources and
> the claimant's financial circumstances must be documented. Where treatment
> is not available, the case will be referred to VR.

SSR 82-59, 1982 WL 31384 (emphasis in original).

In this case, the ALJ asked *one question* about the availability of free or reduced-cost resources, although that question had nothing to do with the availability or use of "free clinics" which formed the sole basis for her dismissal of Bulger's allegations of poverty. Specifically, the ALJ asked whether Bulger had attempted to use an assistance program at the Wal-Mart pharmacy so that he could afford to refill his prescription headache medicine. He testified that he *had* attempted to do so and that, even with that assistance, he could not afford the medication because it would cost him $42.00. (R. 74-75). Thus, to the extent that the ALJ made any effort to ascertain whether Bulger had attempted to use available community resources, the evidence showed that he had done so.

Although the ALJ based her hand-waving dismissal of Bulger's allegation of poverty on her own personal knowledge that "[i]t is well-established that community clinics exist in the local area of the claimant's residence that offer both reduced cost and free medical treatment for indigent people," (R. 21), the ALJ *never asked* Bulger whether *he* knew about the unnamed "community clinics" in the "area of [his] residence," whether he qualified to use those resources, or whether he had attempted to use those resources. (R. 21). The ALJ

most definitely did not attempt to explore "all . . . possible resources (e.g., clinics, charitable and public assistance agencies, etc.)" or document "contacts with such resources and the claimant's financial circumstances" as required by SSR 82-59.  Therefore, the lack of "evidence that the claimant sought treatment from any of these facilities, or that he has even inquired about the availability of such treatment" does not prove anything about whether community resources were available to Bulger or whether he had failed to avail himself of those resources. The only thing the lack of evidence proves is that the ALJ utterly failed in her duty to develop the record.

Further, SSR 82-59 provides that, "before a determination is made, the individual . . . will be made informed of this fact [that the claimant does not have a good reason for failing to follow treatment] and of its effect on eligibility for benefits." *Id.* The Commissioner is required to give the individual "an opportunity to undergo the prescribed treatment or to show justifiable cause for failing to do so." *Id.*  Thus, the ALJ failed to follow SSR 82-59 when she neglected to inform Bulger about the free and reduced-cost treatment resources of which she claimed to be aware, to offer him an opportunity to use those resources, and to inform him about the consequences of his failure to do so.  In fact, the ALJ so thoroughly failed to comply with SSR 82-59 that there is reason to question whether she familiarized herself with the opinion before citing it.

The court notes that, under the circumstances of this case, the ALJ's reliance on the lack of "evidence that the claimant sought treatment from any of these [free] facilities, or that

24

he has even inquired about the availability of such treatment" (R. 21) is particularly egregious. In any case, failing to develop the record and shifting the burden to the claimant with respect to evidence of unjustified compliance is legal error, *see Dawkins*, 848 F.2d at 1211, but the court notes that it is particularly egregious to expect a claimant whose medically-determined impairments include borderline intelligence to do the ALJ's job for her, unprompted. Here, the ALJ simply assumed that just because it is "well-established" that some sort of free or reduced-cost clinics exist somewhere in the vicinity of Bulger's home, that a man with borderline intelligence knew about them and qualified for them, and, further, that he would have thought to tell the ALJ about any attempts to avail himself of those resources without the ALJ bothering to ask. SSR 82-59 certainly does not allow for such an assumption under any circumstances.

Accordingly, the ALJ's stated reason for discrediting Bulger's subjective testimony on the basis of lack of treatment was not supported by substantial evidence and was the product of legal error. *Ellison*, 355 F.3d at 1275; *Marbury*, 957 F.2d at 839 (11th Cir. 1992); (11th Cir. 2003).

### 3.     Dr. Bendinger's Reports

In assessing residual functional capacity, the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor. *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987). Further, the ALJ is required to accord considerable weight to the opinions of the claimant's treating physicians absent good cause for not doing so. *Id*.

at 279-80.

Bulger argues that the ALJ erred because substantial evidence did not support her decision to reject the following opinions of Dr. Bendinger:

1.  Dr. Bendinger's April 14, 2009 opinion that "the patient's ability to do work related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling is relatively unimpaired with the exception of the chronic pain in his back and left groin" (R. 256);

2.  Dr. Bendinger's February 23, 2011 responses to a physical capacities evaluation form in which he stated that Bulger could only lift and/or carry five to ten pounds occasionally and one to five pounds frequently, sit two hours during an eight hour workday, stand or walk 2 hours during an eight hour workday, rarely climb, balance, bend or stoop, and occasionally push, pull, reach, or perform fine or gross manipulation; and that Bulger would likely be absent from work four days per month as a result of the "impairments of treatment" (R. 282); and

3.  Dr. Bendinger's February 23, 2011, responses on a "clinical assessment of pain" form in which he indicated that Bulger experienced pain "to such an extent as to be distracting to adequate performance of daily activities or work," that physical activity "[g]reatly increased pain and to such a degree as to cause distraction from tasks or total abandonment of task," and that "[s]ome limitations may be present" due to the side effects of Bulger's medications "but not to such a degree as to create serious problems in most instances" (R. 284).

The ALJ did not reject Dr. Bendinger's April 14, 2009 opinion that Bulger's "ability to do work related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling is relatively unimpaired with the exception of the chronic pain in his back and left groin." (R. 20). In fact, the ALJ considered this finding to be "extremely significant," and the ALJ relied heavily on this statement by Dr. Bendinger as

26

a basis for *rejecting* both Bulger's subjective statements of pain and the latter two of Dr.

Bendinger's opinions listed above.  (R. 20).  Specifically, the ALJ stated:

> The claimant, in documentation of record, has alleged borderline intellectual functioning, depression, lumbar radiculopathy, hypertension, back and groin pain as a basis of disability. The undersigned concludes that, while the record contains evidence of the existence of these impairments, the objectively demonstrable evidence of record fails to support that the claimant is as impaired as he has alleged. The undersigned concludes that no credible treating or consultative physician has opined that the claimant was disabled because of any physical and/or mental condition or from any resulting symptoms. The Administrative Law Judge specifically notes that the records from Dr. Bendinger reflected essentially normal examinations. The Administrative Law Judge notes that [in April 2009] Dr. Bendinger stated the only significant findings were lumbosacral area paravertebral muscle tenderness and left groin tenderness. The Administrative Law Judge finds it extremely significant that [in April 2009] Dr. Bendinger found the claimant's ability to do work related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling to be relatively unimpaired with the exception of the chronic pain in his back and left groin. X-rays of the lumbosacral spine were essentially within normal limits. The Administrative Law Judge recognizes that [in February 2011] Dr. Bendinger completed a physical capacities evaluation on which he indicated the claimant could perform less than the full range of sedentary work activity. The Administrative Law Judge does not give significant weight to that physical capacities evaluation because it conflicts with Dr. Bendinger's own records as well as the remainder of the treatment records. Specifically, it is noted that there is no evidence to support the dramatic change in opinion offered by Dr. Bendinger in April 2009 in Exhibit 1-F when compared to the opinions offered by Dr. Bendinger in February 2011 in Exhibits 7-F and 8- F. Moreover, the treatment notes from Dr. Bendinger in Exhibits 2-F, 9-F and 10-F do not support the limitations offered referenced in February 2011.

(R. 20).

However, as noted throughout this opinion, the ALJ completely and expressly

disavowed the very existence of relevant contents of exhibits 9F and 10F.  Exhibit 9F

included the ignored records from Dr. Bendinger's September 30, 2010 treatment of Bulger for headaches and uncontrolled high blood pressure secondary to pain; the overlooked evidence that Bulger was prescribed (and took) various medications for these and other conditions; and the completely misconstrued evidence that Bulger's April 2014 X-ray was "essentially within normal limits" *except for* the rather significant yet conveniently-overlooked fact that the X-ray confirmed an abnormality consistent with Bulger's lower back injury.

Exhibit 10F, substantial portions of which the ALJ also clearly overlooked, contains Dr. Bendinger's evaluation of Bulger for disability in January and February 2011 and his explanation for the opinions stated in the February 2011 disability forms (*i.e.*, the physical capacities evaluation and clinical evaluation of pain) (R. 292-96). Specifically, Exhibit 10F includes such overlooked relevant evidence as Dr. Bendinger's diagnosis of trigeminal autonomic cephalgias, Dr. Bendinger's statement that "in addition to his chronic back pain" and groin pain, Bulger "has chronic headaches >3 times per week [and] poorly controlled blood pressure," all of which "make it difficult to climb, lift, carry, sit for long periods of time," that Bulger "is currently being treated with muscle relaxers and steroids, cephadyn," and that, on January 31, 2011, Bulger's blood pressure was 190/124. Thus, when Bulger was referred to Dr. Bendinger in 2009, his allegedly disabling impairments were back pain and groin pain (R. 254), but, at the time of the ALJ's opinion, he also had *undisputed* additional impairments of headaches and hypertension for which he had been treated and diagnosed

28

*after* April 2009, *as documented in Exhibit 9F and 10F*.

Further, although the ALJ found (and the parties do not dispute) that Dr. Bendinger was Bulger's treating physician, he was not Bulger's treating physician on April 14, 2009. April 14, 2009 was the *first time* (or the first time in at least three years)[8] that Dr. Bendinger treated Bulger; thus, at that time, Dr. Bendinger "did not have[] an ongoing treatment relationship with [Bulger]." 20 C.F.R. § 404.1502. As the ALJ recognized[9] (R. 18), Dr. Bendinger performed the April 14, 2009 examination as a consultative examiner for the Commissioner. (R. 18, 253). Therefore, by definition, on April 14, 2009, Dr. Bendinger was

---

[8]There is some evidence that Dr. Bendinger treated Bulger in 2006 after his initial back injury. (*E.g.*, R. 237). However, medical records of Bulger's initial back injury are not included in this record, and there is no medical record indicating that Dr. Bendinger treated or evaluated Bulger at any time between 2006 and April 2009. In April 2010 and January 2011 (R. 237; R. 245), Bulger indicated that he had been taking Piroxicam consistently for inflamation and groin pain since 2006, which Dr. Bendinger had prescribed, but this statement is not consistent with Dr. Bendinger's records, and the inconsistency is not capable of resolution on the present record. Thus, there is no evidence that Dr. Bendinger was Bulger's treating physician prior to April 2009. *See* 20 C.F.R. § 404.1502 ("We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s)").

[9]The ALJ stated that "Dr. Bendinger conducted a consultative examination of the claimant on September 28, 2010 at the request of the Social Security Administration." (R. 18). This statement contains an error as to the date of the consultative examination; the record establishes that Dr. Bendinger performed the consultative examination on April 14, 2009. (R. 253-54, 258, 260-63, 269). Dr. Bendinger did treat Bulger for headaches and uncontrolled blood pressure secondary to pain on *September 30*, 2010, (R. 285) but, as explained in section IV.A. of this opinion, the ALJ completely ignored the existence of the treatment record dated September 30, 2010. Elsewhere in her opinion, the ALJ appears to recognize that Dr. Bendinger's consultative examination took place in April 2009. (R. 20).

The court has not found any record of a consultative or any other examination performed by Dr. Bendinger on September 28, 2010. Given this and the many other inconsistencies between the ALJ's statements of the contents of the medical records and the actual contents of those records, the court has attempted to resolve its own lingering suspicion that the ALJ was not in fact looking at the same record as is before this court. After reviewing the record and the opinion of the ALJ at length, however, the court has concluded that the ALJ was indeed looking at the same record, but simply failed to see what she was looking at. If, however, any relevant medical records are missing (such as a consultative examination dated September 28, 2010 or medical records of Bulger's initial back injury in 2006), the court expects that the problem will be remedied on remand.

*not* Bulger's treating physician, but a "nontreating physician." 20 C.F.R. § 404.1502. His opinion that Bulger's "ability to do work related activities such as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking and traveling is relatively unimpaired with the exception of the chronic pain in his back and left groin" was *not* the medical opinion of a treating physician. 20 C.F.R. § 404.1502.

However, as documented in Exhibits 9F and 10F, Dr. Bendinger treated Bulger on several occasions and it is not disputed that, by the date of the ALJ's opinion, he was Bulger's treating physician. During the time in which Dr. Bendinger became Bulger's treating physician, he treated and diagnosed impairments which were not present during the April 2009 examination[10] (headaches and high blood pressure), and he subsequently revised his opinions about Bulger's disabilities based on the fact that Bulger suffered from headaches and high blood pressure in addition lower back and groin pain (R. 292). Nevertheless, the ALJ clearly chose to credit the consultative report of a nontreating physician (Dr. Bendinger's April 2009 report) over the subsequent opinions and treatment records developed by Bulger's treating physician, and she did so without good cause and without acknowledging the greater weight due Dr. Bendinger's later records in his capacity as treating physician. This was legal error. 20 C.F.R. § 404.1527(c)(2) ("Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the

---

[10]During the April 2009 examination, Bulger's chief complaints were groin and back pain due to an on-the-job injury. He denied having hypertension (R. 254) and was not diagnosed with hypertension (R. 256) although his blood pressure was 146/90 (R. 255). He did not complain of headaches.

medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."); *Lewis*, 125 F.3d at 1441 (recognizing that the opinion of a treating physician must be accepted absent good cause to the contrary).

The law does not necessarily require the ALJ to accept the validity of Dr. Bendinger's post-April 2009 findings, treatment records, and opinions, but it *does* require that, in determining Bulger's residual functional capacity and in evaluating the credibility of Bulger's allegations of pain, she must consider *all* the relevant evidence in the case record, and she must specifically state "good cause" for rejecting the medical opinions of a treating physician. 20 CFR § 404.1545(a)(1); 20 CFR § 416.929(c)(1); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997). The ALJ cannot simply close her eyes to the relevant portions of Dr. Bendinger's records in Exhibit 9F and 10F, which document events that occurred *after* April 14, 2009 (including treatment for headaches and high blood pressure and the establishment of a treating physician relationship), and then declare that there is "no evidence" in Exhibit 9F or 10F indicating that anything occurred between April 14, 2009 and February 2011 that could have caused Dr. Bendinger to revise his diagnoses and opinions or to find that Bulger suffered from anything more than lower back and groin pain. Neither can the ALJ ignore those records from Dr. Bendinger in Exhibit 9F and 10F that do *not* "reflect[]

essentially normal examinations" and then declare that Dr. Bendinger's examinations were all "essentially normal" (R. 20).  Accordingly, the ALJ erred as a matter of law, and the reasons stated in her opinion were not supported by substantial evidence, when she credited Dr. Bendinger's April 2009 consultative report while disregarding, misstating, and ignoring relevant portions of Dr. Bendinger's subsequent treatment records, clinical findings, and opinions.

## V. Conclusion

Accordingly, the court concludes that the decision of the Commissioner denying benefits to Bulger should be reversed and remanded for further proceedings consistent with this opinion.

Further, it is

**ORDERED** that, in accordance with *Bergen v. Comm'r of Soc. Sec.*, 454 F.3d 1273, 1278 n.2 (11th Cir. 2006), the plaintiff shall have sixty (60) days after he receives notice of any amount of past due benefits awarded to seek attorney's fees under 42 U.S.C. § 406(b). See also *Blitch v. Astrue*, 261 Fed. Appx. 241, 242 n.1 (11th Cir. 2008).

The Court will enter a separate final judgment.

Done this 12th day of September, 2014.

              /s/Charles S. Coody
              CHARLES S. COODY
              UNITED STATES MAGISTRATE JUDGE